IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNEDY NICHOLE GIDDENS, | ) | Case No. 5:21-cv-1431 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Kennedy Nichole Giddens, pro se, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act. Giddens challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ: (i) erred in determining that she did not satisfy the criteria of Listings 12.04, 12.06, 12.08, 12.11, and 12.15; (ii) failed to obtain a consultative examination; (iii) misevaluated her subjective mental health symptom complaints; and (iv) erred in determining that there were other jobs in the national economy that she could perform. Because the ALJ improperly analyzed the Listings' criteria and failed to adequately explain his reasons for discounting Giddens's subjective symptom complaints, I recommend that the Commissioner's final decision denying Giddens's application for SSI be VACATED and that Giddens's case be REMANDED for further consideration.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## I.     Procedural History

Giddens applied for SSI on August 22, 2019.  (Tr. 140).[2]  Giddens alleged that she became disabled on June 1, 2010 due to: "1. depression; 2. anxiety; 3. mood disorder; 4. bi-polar disorder; 5. post traumatic stress disorder; 6. attention deficit hyperactive disorder; 7. conduct disorder; 8. sensory processing disorder; 9. [o]bsessive compulsive disorder; 10. [o]ppositional defiant disorder; 11. asthma; [and] 12. learning disability."  (Tr. 140, 155).  The Social Security Administration denied Giddens's application initially and upon reconsideration.  (Tr. 65-78, 81-89).  Giddens then requested an administrative hearing.  (Tr. 100-01).

On October 29, 2020, ALJ Michael Schmitz held a hearing on Giddens's case, at which she appeared pro se, and denied Giddens's application in a March 19, 2021 decision.  (Tr. 19-28, 33-64).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Giddens's mental impairments did not meet or equal the criteria for Listings 12.04, 12.06, 12.08, 12.11, and 12.15.  (Tr. 22-23).  At Step Four, the ALJ determined that Giddens had the residual functional capacity ("RFC") to perform work at all exertion levels except:

> [Giddens] can perform simple, routine and repetitive tasks, but not at a production-rate pace, such as assembly line work, and she can make only simple work-related decisions which do not involve being responsible for the safety or welfare of others; she can interact on an occasional basis with supervisors, and a small group of familiar coworkers, but not more than incidental contact with the public, and all of her interactions must be superficial in nature, meaning no sales, arbitration, negotiation, conflict-resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction, or persuasion of others; and she can respond appropriately to occasional changes in a routine and relatively static work setting, so long as any such changes are explained and/or demonstrated to her in advance of gradual implementation.

(Tr. 24).  Based on vocational expert ("VE") testimony that an individual with Giddens's age, experience, and RFC could work as a hospital cleaner, cleaner II, and cafeteria attendant, the

---

[2] The administrative transcript appears in ECF Doc. 8.

2

ALJ determined that Giddens was not disabled.  (Tr. 27-28).  On June 30, 2021, the Appeals

Council denied further review, rendering the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-3).  On July 26, 2021, Giddens filed a complaint to obtain judicial review.

ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Giddens was born on January 31, 2000.  (Tr. 140).  She was 10 years old on the alleged

onset date and 21 years old at the time of the ALJ's decision.  (Tr. 28, 65, 140).  Giddens

completed high school in June 2019, where she attended special education classes.  (Tr. 156).

And she had completed two years of college at Kent State University towards a degree in special

education.  (Tr. 45).  Giddens also had past relevant work as a material handler, which the ALJ

determined she could not perform.  (Tr. 27, 157).

### B.     Relevant Medical Evidence

Giddens focuses her challenge upon the ALJ's consideration of the evidence and

subjective symptom complaints regarding her mental health impairments at Steps Three through

Five of the sequential evaluation process; thus, I will summarize only the medical and opinion

evidence related to her mental health impairments.  *See generally* ECF Doc. 6; ECF Doc. 9;

*United States v. Olano*, 507 U.S. 725, 733 (1993).

On March 4, 2016, Giddens sought treatment with Child Guidance & Family Solutions,

reporting that she was concerned about suicidal and homicidal ideations.  (Tr. 323).  During their

intake session with Brent Walters, LPCC-S, Giddens and her mother reported that: (i) Giddens

was physically abused by her older sister in 2007; (ii) between 2008 and 2010, Giddens's parents

separated and Giddens lived with her mother; (iii) in 2012, Giddens's father prevented her from

moving with her mother to Georgia; (iv) due to child neglect, Giddens's mother obtained custody and brought Giddens and her older brother to Ohio in 2014; (v) between November and December 2015, Giddens and her family were homeless.  (Tr. 323, 326-27, 329-30).

Giddens and her mother further reported that: (i) three to four times per week Giddens (a) did not enjoy things she normally would, (b) did not want to be touched or talked to, (c) had suicidal thoughts, (d) had thoughts of hurting others, and (e) experienced low self-esteem/hopelessness; (ii) she regularly heard voices that told her to hurt herself and others and that she was "not good enough"; (iii) she'd had suicidal thoughts since second grade, she attempted suicide by hanging while in second grade, and she had formulated a plan to commit suicide again; (iv) her mother's departure to Georgia was a traumatic experience she relived through flashbacks; (v) three times per week she displayed defiant behavior towards teachers and anger outbursts directed at friends and family; and (vi) disruption in her routine would ruin her day.  (Tr. 323-26, 329-30).  On mental status exam, Giddens had unremarkable results.  (Tr. 325).  Clinical Counselor Walters diagnosed Giddens with: (i) major depressive disorder, recurrent, moderate; (ii) adjustment disorder with mixed disturbances of emotions and conduct; (iii) "rule out" post-traumatic stress disorder ("PTSD"); and (iv) "rule out" obsessive compulsive disorder ("OCD").  (Tr. 330).  Clinical Counselor Walters recommended therapy, group counseling, and a psychiatric evaluation.  *Id.*

On March 24 and April 4, 2016, Giddens underwent psychiatric evaluation with Megan M. Clark, PMHCNS-BC.  (Tr. 344-51).  In addition to the background in formation summarized above, Giddens reported that she was in 9th grade in an individualized education program ("IEP") and had a 4.0 grade point average.  (Tr. 346-47).  Giddens also reported that she was easily irritated by teachers and peers and she would sometimes yell at other students when they

did not understand the material.  (Tr. 347).  Giddens's mother reported that Giddens was attending coping classes twice per week and in-home therapy, with improvement in Giddens's depression.  (Tr. 344-45).  Clinical Nurse Clark diagnosed Giddens with: (i) major depressive disorder recurrent, moderate; (ii) adjustment disorder with mixed disturbance of emotions and conduct; (iii) obsessive compulsive personality traits; and (iv) PTSD.  (Tr. 350-51).  Clinical Nurse Clark recommended continued therapy and prescribed fluoxetine.  (Tr. 351).

On October 27, 2017, Giddens was hospitalized by her mother for suicidal ideation and planning.  (Tr. 254).  Giddens's mother reported that after initially denying thoughts of harm, Giddens's counselor called her four days earlier to report that Giddens had been researching the bodily effects of bleach and the length of time between ingestion and death.  *Id.*  Giddens's mother further reported that: (i) Giddens became withdrawn and somnolent and began having "full blown arguments with herself"; (ii) Giddens "pulled out a sword out on mom and told her that she should just kill her because they would all be better off," requiring police intervention; and (iii) Giddens subsequently became isolated and threatened to kill her mother and younger (11-year-old) brother.  *Id.*  Giddens herself reported that: (i) her family was homeless and living in someone's basement, which was taking its toll; (ii) she had attempted to harm her younger brother, whom she sometimes wanted dead; (iii) she had twice attempted suicide by overdose; and (iv) her grades had dropped from straight As to Bs and Cs.  (Tr. 254-256).  On mental status exam, Giddens was irritable, inattentive, tense, uncooperative, and easily distractible, with a short attention span, and had poor insight.  (Tr. 256-57).  Giddens was diagnosed with: (i) bipolar disorder, current episode mixed, severe, without psychotic features; (ii) PTSD, chronic; and (iii) conduct disorder, adolescent-onset type.  (Tr. 257).  Giddens was admitted and prescribed Seroquel.  *Id.*

5

On November 1, 2017, Giddens was discharged from the hospital after having spent a consecutive 72-hour period without suicidal or homicidal ideation.  (Tr. 260, 266).  Giddens reported a decrease in excessive worrying, anger, and anger episodes.  (Tr. 266-67).  Upon mental status exam, Giddens had unremarkable results.  (Tr. 267).  She was prescribed Seroquel and Zoloft.  (Tr. 268).

On November 26, 2018, Giddens's eligibility for special education services was reevaluated.  (Tr. 285-99).  Up to that point, Giddens had been attending in-person class half the day and online classes after school, she was in the top fourth of her Algebra and English classes, and she had generally average cognitive function.  (Tr. 286-88, 292-94).  Giddens reported that she received counseling services and spent her free time watching Netflix, shopping, playing video games, listening to music, playing sports, eating at restaurants, bowling, and swimming. (Tr. 288-89).  Giddens's teachers reported that Giddens was highly motivated and independent but could be confrontational when frustrated and had unstable mood/anger.  (Tr. 290, 294, 296-97).  Based on Giddens's academic and cognitive assessments, she was determined no longer eligible for special education services.  (Tr. 298-99).

On November 30, 2018, Giddens was evaluated for placement on a Section 504 plan given her diagnoses of major depressive disorder and adjustment disorder, which mainly affected her ability to concentrate and handle anxiety-inducing situations (tests and quizzes).  (Tr. 311-13).  The evaluator determined that Giddens's diagnoses "substantially" limited her, such that placement on a Section 504 plan was necessary.  (Tr. 313).

Meanwhile, Giddens received psychiatric and counseling treatment at Child Guidance & Family Solutions.  (Tr. 331-43, 355-94).  On December 5, 2018, Giddens reported that the IEP reevaluation triggered a "meltdown," which resulted in the Section 504 plan as a compromise.

6

(Tr. 356).  Giddens's mother stated that "episodes like this occur on a regular basis."  *Id.*  Her mental status exam results were unremarkable.  (Tr. 357-58).  The attending physician stated that Giddens's condition was worsening, increased her Seroquel dosage, and refilled her prescriptions.  (Tr. 359-60).

On February 25, 2019, Giddens visited Joseph Dull, MD, reporting trouble regulating emotions, mostly anger.  (Tr. 361-62).  Giddens reported that she went from "0-60" on a daily basis, which was followed by throwing items, yelling, and verbally threatening others.  (Tr. 362).  She also reported racing thoughts, impulsivity, and trouble sleeping.  *Id.*  Giddens reported that she worked part-time (20 hours) in fast food.  *Id.*  On mental status exam, Giddens had unremarkable results except for irrational thought process, tangential thought associations, and impaired judgment.  (Tr. 363-66).  Dr. Dull increased Giddens's Seroquel and refilled her Zoloft script.  (Tr. 368).

On March 25, 2019, Giddens returned to Dr. Dull, reporting that she was sent home after striking another student and not regularly attending classes.  (Tr. 369-70).  She also reported more irritability and lack of sleep.  (Tr. 370).  On mental status exam, Giddens had irrational thought process, homicidal thought content, tangential thought association, impaired judgment, constricted affect, and difficulty recalling events.  (Tr. 371-73).  Dr. Dull noted that Giddens's condition was worsening, replaced Seroquel with Risperdal, and refilled her Zoloft script.  (Tr. 373-74).

On April 15 and 23, 2019, Giddens reported to Dr. Dull improved mood, sleep, and agitation levels with the medication change.  (Tr. 375-76, 381-82).  Her mental status exam results were unremarkable, except for mild anger.  (Tr. 376-78, 383-84).  Dr. Dull noted that

Giddens's condition was stable or improving and continued her medication.  (Tr. 379-80, 384-86).

On June 11, 2019, Giddens reported to Dr. Dull that she'd had more variable mood since graduating from high school and there was a new baby in the house.  (Tr. 388).  Her mental status exam results were unremarkable.  (Tr. 389-90).  Dr. Dull noted that Giddens's condition was stable or improving, with "partial" improvement since beginning treatment, and continued her medication.  (Tr. 390-92, 394).

On September 16, 2019, Giddens established care with Tonya Gessler, PMHNP-BC.  (Tr. 611).  Giddens reported that she was "doing well overall," though she felt overwhelmed with work and school.  (Tr. 612-13).  Her mental status exam results were unremarkable, except for mild anxiety and depression.  (Tr. 612-13).  Nurse Practitioner Gessler diagnosed Giddens with unspecified affective mood disorder, unspecified anxiety disorder, and attention deficit hyperactive disorder ("ADHD").  (Tr. 613).  Nurse Practitioner Gessler stated that Giddens's condition was "stable," prescribed Concerta for Giddens's ADHD and continued her other medications.  (Tr. 613-15).

On January 13, 2020, Giddens reported to Nurse Practitioner Gessler that she had problems focusing and sleeping due to nightmares.  (Tr. 662).  She'd also had a "meltdown" after fighting with her mother.  *Id.*  On mental status exam, Giddens had unremarkable results, except constricted affect, moderate anxiety, and mild depression.  (Tr. 663-64).  Nurse Practitioner Gessler listed Giddens's diagnoses as bipolar disorder, unspecified anxiety disorder, ADHD, and moderate intellectual developmental disorder, all of which Nurse Gessler described as "stable or improved."  (Tr. 664-65).  Nurse Gessler adjusted Giddens's medication dosages

8

for Abilify and Zoloft and prescribed prazosin for her flashbacks. (Tr. 665). Nurse Practitioner Gessler described Giddens's progress as "Baseline." (Tr. 666).

On March 12, 2020, Giddens reported to Nurse Practitioner Gessler that she was "doing well" with her medication change. (Tr. 673). Her mental status exam results were unremarkable, except for mild anxiety and depression. (Tr. 674). Nurse Practitioner Gessler stated that Giddens's conditions were all "stable or improved" and continued medication, describing her progress as "Stable." (Tr. 675-77).

On June 8, 2020, Giddens reported to Nurse Practitioner Gessler that she was doing "ok" and that her mood had been "stable." (Tr. 718-19). She also requested a change in medication because she had difficulty with concentration. (Tr. 719). On mental status exam, she had unremarkable results. (Tr. 719-20). Nurse Practitioner Gessler increased her dosage of Concerta and continued her other medication, describing her progress as "Stable." (Tr. 720-22).

On October 2, 2020, Giddens reported to Nurse Practitioner Gessler that she was taking 17 credit hours at university and felt overwhelmed because of concentration problems. (Tr. 723-24). She reported that she did not feel that Concerta was effective, though her mood was stable. (Tr. 724). Upon mental status exam, Giddens had unremarkable results, except for constricted affect and mild anxiety and depression. (Tr. 724-25). Nurse Practitioner Gessler replaced Concerta with Vyvance and continued Giddens's medication, noting that Giddens's progress was "Stable." (Tr. 726-27).

Meanwhile, Giddens received counseling at Child Guidance & Family Solutions through September 14, 2020. (Tr. 743-779). Giddens's last counseling treatment notes indicated that she felt she had made only partial-to-moderate progress and she had ongoing concerns related to depression and anxiety. (Tr. 779).

On October 24, 2020, Giddens presented to the emergency department following a suicide attempt by overdose.  (Tr. 914, 928).  Giddens reported that she'd been noncompliant with her medication and attempted suicide because Giddens's girlfriend told Giddens she no longer loved Giddens.  *Id.*  On October 26, 2020, Giddens was discharged in stable condition to inpatient psychiatric treatment.  (Tr. 940-41, 953).

On October 29, 2020, Giddens visited Kaitlin Lanigan, LPC, and underwent an outpatient behavioral health assessment.  (Tr. 784).  Giddens reported several stressors that precipitated her suicide attempt: (i) she had to rehome her dog; (ii) she had been shamed by her older sister for her sexual orientation; (iii) she and her girlfriend broke up; and (iv) her mother took all her money and was behind on bills.  (Tr. 784-86, 793).  Giddens reported that her depression symptoms started getting worse over the six previous months, and she'd been unemployed for the same length of time.  (Tr. 784, 786, 789).  Giddens reported her depression symptoms as irritability, loss of interest in all things, decreased appetite, feelings of worthlessness, and diminished ability to concentrate.  (Tr. 789).  Giddens reported monthly episodes of manic mood. *Id.*  She reported weekly panic attacks and recurrent nightmares of traumatic events.  *Id.*  And she reported hearing a voice telling her she was better off dead and a desire to hit others.  (Tr. 793).  On mental status exam, Giddens had unremarkable results, except for auditory hallucinations, attention deficit, and self-abusive behavior with frustration (hitting or punching herself).  (Tr. 790-91).  Clinical Counselor Lanigan diagnosed Giddens with bipolar II, PTSD, and ADHD and recommended partial hospitalization.  (Tr. 792-93).

On November 10, 2020, Giddens was discharged from the partial hospitalization program after she and her treatment team agreed she received the maximum benefit from treatment.  (Tr. 843).  Her mental status exam results were unremarkable.  (Tr. 843-44).  Clinical Counselor

Lanigan stated that Giddens's treatment records reflected a reduction from "severe anxiety" to "mild anxiety" and from "severe depression" to "minimal depression." (Tr. 847).

On November 12, 2020, Giddens started an intensive outpatient treatment program at Summa Behavioral Health. (Tr. 847, 854, 857). Giddens underwent a psychiatric evaluation, reporting that she was "doing well on her current medication." (Tr. 856). Her mental status exam results were unremarkable. (Tr. 857). Between November 12, 2020 and January 28, 2021, Giddens attended group therapy sessions as part of her treatment program. (Tr. 850-51, 859-902). On January 28, 2021, Giddens was discharged from the intensive outpatient treatment program. (Tr. 907). She had "minimal" depression and anxiety at the time of discharge. *Id.*

### C.  Relevant Opinion Evidence

On October 28, 2019, Demetri Dres, MD, evaluated Giddens's mental capacity based on a review of the medical record. (Tr. 71, 74-75). Dr. Dres determined that Giddens was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration, work in coordination with or in proximity to others, complete a workday without interruptions, respond appropriately to changes in the work setting, and set realistic goals/make plans independently of others. (Tr. 74-75). Dr. Dres opined that Giddens's mental conditions limited her to: simple, repetitive tasks with flexible production standards; no urgent tasks, no public contact tasks; brief and superficial interactions with coworkers and supervisors; and work in a static environment where job demands were routine and predictable. (Tr. 75). On April 8, 2020, Todd Finnerty, PsyD, concurred with Dr. Dres's assessment of Giddens's mental functional capacity. (Tr. 87-88).

### D. Relevant Testimonial Evidence

Giddens testified at the ALJ hearing that she lived with her mother and younger brother. (Tr. 45). Giddens testified that she was in her second year of college towards becoming a special education teacher. *Id.* She was taking 17 credit hours (5 classes) in her current semester. (Tr. 50). Giddens received special accommodations, including extended testing time, extended deadlines, small group testing, calculator use for math, and note-taking services. (Tr. 46, 53). Because of her recent hospital stay and outpatient treatment, she had missed lots of classes. (Tr. 45-46). Before the current semester, she had a 2.5 GPA. (Tr. 46).

Giddens testified that what most prevented her from working was time management and social skills. (Tr. 48). Giddens stated that she got stressed easily, and when she got overly stressed and there were "too many things … going on" she'd wind up in the hospital. *Id.* Giddens testified that she had panic attacks at least once per day for up to 30 minutes, consisting of shortness of breath, racing thoughts, rapid heartbeat, and shaking. (Tr. 50-51). She also had crying spells at least twice per week. (Tr. 51). And she had daily mood swings accompanied by anger episodes. (Tr. 51-52). Giddens testified that earlier that day, she yelled at and bit her mother. (Tr. 52).

Giddens testified that on a typical *manic* day, she would clean, do homework, and help around the house. (Tr. 52). On a *depressive* day, she would not get out of bed, shower, or eat. *Id.* Her mood swings were evenly split between manic and depressive. *Id.* Giddens testified that because of her ADHD, she sometimes would get up and leave in the middle of a class. (Tr. 53). Her hobbies consisted of watching Netflix, during which did other things (such as getting a drink or playing on her phone). (Tr. 53-54).

12

Giddens testified that because of her OCD, she did not like it when people went into her room and touched her things. (Tr. 54). She needed to sit in the same seat every time. *Id.* She liked things in numbers of seven. *Id.* And she always made sure things that weren't being watched were turned off. *Id.*

Giddens testified that did not get along well with her brother, whom she sometimes wanted to kill. (Tr. 55). With her mother, Giddens stated she maintained a "touch and go" relationship. *Id.* Otherwise, her only social interactions were with her father and grandmother, and she had no friends. *Id.*

The ALJ called a VE, Sarah Holmes, and asked her to assume someone with Giddens's age, education, and experience with additional non-exertional limitations: (i) only simple, routine and repetitive tasks; (ii) no work at a high production rate pace; (iii) occasional interaction with supervisors and a small group of familiar coworkers with only incidental interaction with the general public; (iv) superficial contact with others , meaning (a) no sales, arbitration, negotiation, conflict resolution or confrontation, (b) no group, tandem or collaborative tasks, and (c) no management, direction, or persuasion of others; (v) occasional changes in routine and a relatively static work setting; and (vi) changes must be easily explained and/or demonstrated in advance with gradual implementation. (Tr. 57-60). The VE testified such an individual could not perform Giddens's past work but could perform work as a hospital cleaner, cleaner II, and cafeteria attendant. (Tr. 60). The VE testified her answer would not change if the individual were further limited to simple work-related decisions and should not be responsible for the welfare or safety of others. *Id.* If the individual were further limited to work in isolation, the VE testified there would be no jobs the individual could perform. (Tr. 60-61).

### III.    Law & Analysis

#### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Listings

Because Giddens is proceeding pro se, the court must liberally construe her arguments. [3] Doing so, I conclude that she argues that the ALJ erred in concluding that her mental health impairments did not meet the criteria of a listed impairments. ECF Doc. 9 at 2-4.  Specifically, she argues that the ALJ did not adequately consider the severity of her conditions when analyzing the paragraph B criteria. ECF Doc. 9 at 3-4.  She argues that the ALJ's finding of only "moderate limitations" in her ability to adapt or manage herself was unsupported because it focused too heavily on the fact that Giddens had experienced unlikely-to-be-repeated external stressors and failed to account for her daily symptoms. ECF Doc. 9 at 4.  As to the daily symptoms, both Giddens and her mother described them as causing more than moderate limitations. *Id.*

The Commissioner responds that the ALJ's paragraph B findings should be affirmed because they were consistent with and supported by the findings of the state agency consultants. ECF Doc. 10 at 12-13.  And the Commissioner argues that the opinion of the state agency consultants was supported by the record, citing the ALJ's discussion of the evidence at Step Four. ECF Doc. 10 at 13-14.  The Commissioner further argues that the ALJ reasonably

---

[3] *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also Jones v. Comm'r of Soc. Sec.*, No. 14-6066, 2015 U.S. App. LEXIS 23433, at *8 (6th Cir. June 10, 2015) (unreported).

determined that Giddens did not satisfy the paragraph C criteria for Listings 12.04, 12.06, and 12.15 because she attained "maximum benefit" from hospitalization, was actively engaged with treatment, her symptoms were effectively alleviated while compliant with medication, and her activities of daily living were inconsistent with the requirements of paragraph C.  ECF Doc. 10 at 15-16.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 416.920(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Listings 12.04, 12.06, 12.08, 12.11, and 12.15 establish the criteria, respectively, for: (i) depressive, bipolar and related disorders; (ii) anxiety and obsessive-compulsive disorders; (iii) personality and impulse-control disorders; (iv) neurodevelopmental disorders; and (v) trauma- and stressor-related disorder.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.04, 12.06, 12.08, 12.11 12.15.  To meet the severity requirement Listings 12.04, 12.06, 12.08, 12.11, and 12.15, the claimant must show that she meets the functional limitations criteria in paragraph B.

16

*id.* §§ 12.00A, 12.04, 12.06, 12.08, 12.11 12.15.  To meet paragraph B, the claimant must show

that her disorder resulted in an extreme limitation of one, or marked limitation of two, of the

following areas of mental functioning: (1) understand, remember or apply information;

(2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage

oneself.  *Id.* §§ 12.04B, 12.06B, 12.08B, 12.11B, 12.15B.

The severity of a limitation is measured on a five-point scale that evaluates the claimant's

ability to function in one of the above areas independently, appropriately, effectively, and on a

sustained basis.  *Id.* § 12.00F2.  The five rating points are: (1) no limitation; (2) mild limitation

(slightly limited functioning); (3) moderate limitation (fair functioning); (4) marked limitation

(seriously limited functioning); and (5) extreme limitation (no ability to function).  *Id.*

A claimant could alternatively meet the severity level for Listings 12.04, 12.06, and 12.15

by satisfying the criteria in paragraph C.  *Id.* §§ 12.04C, 12.06C, and 12.15C.  To meet the

requirements of paragraph C, the existence of the mental disorder must be documented over a

two-year period and there must be evidence of:

> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly
> structured setting(s) that is ongoing and that diminishes the symptoms and signs of
> your mental disorder (see 12.00G2b); and
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in
> your environment or to demands that are not already part of your daily life.

*Id.*

17

1.      **Paragraph B**

The ALJ failed to apply proper legal standards in concluding that Giddens's mental

impairments did not meet or equal the paragraph B requirements for Listings 12.04, 12.06, 12.08,

12.11, and 12.15.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241  Giddens's brief emphasizes three

areas of mental functioning she believes the ALJ failed to adequately analyze: (i) her ability

interact with others because of her anger outbursts and homicidal thoughts; (ii) her ability to

concentrate, persist, or maintain pace because of her ADHD, depressive episodes, and anxiety;

and (iii) her ability to adapt and manage herself because of her suicidal and homicidal ideations,

her mood swings, and her dependence on others to perform daily tasks.  ECF Doc. 9 at 3-4.  In

analyzing these areas of mental functioning, the ALJ found that:

> In interacting with others, [Giddens] has a moderate limitation.  [Giddens's]
> records during the relevant period since the application filing date note some
> conflicts with [her] mother, but generally moderate limitations in her ability to
> interact with and relate to others.  (Ex. 16/F/1; 15F/4)  In consideration of her
> history of conflicts with teachers and other school personnel, there is adequate
> support for a moderate limitation in this area of functioning.  (Ex. 2F/29).
>
> With regard to concentrating, persisting, or maintaining pace, [Giddens] has a
> moderate limitation.  [Giddens] is diagnosed with ADHD, but is typically noted to
> have good concentration, with minimal distractibility during counseling.  (Ex.
> 10F, 2-3, 8, 14; 12F/2, 7).  There is only sufficient support of a moderate
> limitation in [Giddens's] ability to concentrate, persist, or maintain pace, and her
> medications adequately mitigate her attention deficits.
>
> As for adapting or managing oneself, [Giddens] has experienced a moderate
> limitation.  [Giddens's] records consistently indicate moderate limitations in her
> ability to cope with stress, her family situation, and general life circumstances.
> These stressors culminated in a documented intentional overdo[se] in October
> 2020.  (Ex. 17F/5)  While the exacerbation of [Giddens's] symptoms resulted in a
> dangerous condition in that instance, [Giddens's] records directly reflect that she
> was not medication-compliant at that time.  (Ex. 17F/5)  That simultaneously
> allowed for increased symptoms, and also created the condition whereby she had
> an excess amount of medications to consume.  [Giddens] subjectively reported
> that a combination of a break-up, having to re-home her dog, and financial
> stressors contributed to her actions.  (Ex. 14F/1)  That confluence of events is
> unlikely to be replicated, and her mood is noted to be well-regulated when she

takes her medications as prescribed.  (Ex. 15[F])  There is support of moderate
limitations in this area of functioning, but no more than moderate.

(Tr. 22-23).  At first glance, the ALJ's analysis would appear to comply with the regulations.
The ALJ evaluated the evidence, compared it to the requirements of the criteria, and explained
the basis for his findings.  *Reynolds*, 424 F. App'x at 416.

A closer examination of the ALJ's findings, however, reveals several gaps.  In evaluating
the second area of mental functioning, the ALJ did not explain the basis for his determination
that the record revealed "generally moderate limitations in her ability to interact and relate with
others."  (Tr. 23).  The ALJ's analysis provided a conclusion without an explanation of how he
got there.  *Fleischer*, 774 F. Supp. 2d at 877.

In analyzing the third area of mental functioning, the ALJ contrasted Giddens's ADHD
diagnosis with treatment notes documenting objective exam findings of good concentration and
minimal distractibility.  (Tr. 23).  But that's not the full scope of what concentration, persistence,
and maintaining pace entails.  This area of mental functioning encompasses both Giddens's
ability to focus as well as her ability complete tasks in a timely manner, sustain and ordinary
routine and regular attendance, and work a full day without needing more than the allotted
number or length of rest periods.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00E3.  There was
evidence in the record bearing on Giddens's ability to complete tasks and maintain pace, such as:
(i) Giddens's testimony that she received accommodations for her mental impairments at
university, including extended testing time and deadlines (Tr. 46, 53); (ii) Giddens's testimony
that her treatment interfered with her ability to attend class and that she wasn't able to sit through
a full class (Tr. 50, 53); and (iii) Giddens's testimony and statements that she had daily panic
attacks lasting for 30 minutes and that she was inactive during her depressive episodes.  (Tr. 51-
52, 183, 187); 20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00C3 (discussing the relevance of the

19

claimant's own subjective statements to the ALJ's assessment of the paragraph B criteria).  The ALJ's silence on how Giddens's other impairments affected her ability to persist and maintain pace constituted a failure to apply proper legal standards.

That brings us to the ALJ's analysis of the fourth area of mental functioning.  The ALJ ultimately concluded that Giddens had moderate limitations in this area because her mood was "well-regulated" when she was compliant with medication and because the past confluence of events that had led to hospitalization was unlikely to recur in the future.  (Tr. 23).  Giddens's ability to regulate her emotions was relevant.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00E4. The ALJ's finding that Giddens's symptoms were well-managed when she was compliant with medication also had evidentiary support.  (Tr. 375-76, 379-82, 384-86, 390-92, 611, 615, 673, 675-77, 709, 720-24, 726-27, 847, 856).  However, the ALJ's finding that the stressors which precipitated Giddens's suicide attempt were unlikely to reoccur stands on shaky ground.  It's not uncommon for relationships to breakdown.  Financial stress may reoccur, especially given Giddens's unemployment.  And Giddens's depression had been a constant throughout her treatment history, with four suicide attempts and one hospitalization for planning suicide reflected in the medical record.  (Tr. 254, 325-26, 951).  Adapting or managing oneself includes being able to adapt to change and manage symptoms.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00E4.  Giddens's hospitalizations and suicide attempts reflect her difficulty in doing so.

Moreover, the Sixth Circuit has recognized noncompliance with treatment can be the result of the mental impairment itself, and, therefore, neither willful nor without justifiable excuse.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009).  Here, the ALJ did not analyze why Giddens was medication non-compliant (e.g., whether it was the result of her mental impairments) or whether she met the listings *when* she was medication non-compliant.

20

The ALJ's analysis also overlooked other factors that were relevant to the degree to which Giddens could adapt or manage herself.  Giddens's ability to cope with stressors is one thing, but the ALJ also had to consider Giddens's ability to "maintain well-being in a work setting," such as by "maintaining personal hygiene and attire appropriate to a work setting."  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00E4.  Giddens stated that her depression inhibited her ability to shower, and she relied heavily on her mother to motivate her to do basic hygiene.  (Tr. 52, 183-84).  Further, the ALJ's analysis of Giddens's ability to manage her symptoms through medication didn't take the full picture into account.  Relevant to the paragraph B analysis was the degree to which Giddens depended on "[p]sychosocial supports, structured settings, and living arrangements" to function.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00D1.  It may be, as the ALJ found, that Giddens's symptoms were well-managed with medication after her October 20, 2020 hospitalization, but that didn't occur in a vacuum.  It was in three contexts: (i) inpatient hospitalization from October 24 to 29, 2020; (ii) participation in a partial hospitalization program from October 29 to November 10, 2020; and (iii) participation in an intensive outpatient program from November 12, 2020 to January 18, 2021.  (Tr. 794, 846-47, 907, 950-53).  Giddens's condition was noted to have improved from "severe" to "minimal" in that time.  (Tr. 907).  But that improvement was in the context of a highly structured setting with intensive treatment and monitoring.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00D1.

Giddens's living arrangements, which the ALJ's Step Three analysis did not mention, also add context to her ability to manage her symptoms with medication.  According to Clinical Counselor Lanigan's assessment, Giddens's access to her medication had been controlled by her mother and brother at the time of her suicide attempt.  (Tr. 793).  Giddens's mother had locked Giddens's medication in a safe box.  *Id.*  And after Giddens's mother lost the key, Giddens's

brother was responsible for hiding Giddens's medication around the house.  *Id.*  Giddens reported that she depended on her mother to handle her medication, as well as for motivation and paying bills.  (Tr. 183-85, 237).  When viewed in context, the ALJ's finding that Giddens had no more than moderate limitations in this area of functioning was the result of an improper application of the regulations.

The Commissioner does not attempt to argue that the ALJ's paragraph B findings complied with the regulations or that the reasons he gave were supported by substantial evidence.  Instead, the Commissioner argues that the ALJ's *conclusions* were supported by the opinion of the state agency consultant that Giddens had only moderate limitations, the evidence the ALJ discussed at Step Four, and other evidence in the record.  ECF Doc. 10 at 12-14.  But that ALJ's Step Three analysis made no mention of the opinion of the state agency consultants or incorporated by reference his Step Four findings.  Nor did the ALJ's Step Four analysis refer back to his Step Three findings.  We cannot accept the Commissioner's after-the-fact arguments as a substitute for the ALJ's own reasons for his findings.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

Although the Commissioner has not framed her argument in terms of harmless error, that is effectively what she has argued.  We can overlook an ALJ's lack of an explanation for his Step Three findings elsewhere in the record to support his Step Three conclusions.  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).  As will be discussed below, the ALJ's RFC findings are largely unexplained, so they cannot be relied upon to fill in all the gaps in the ALJ's Step Three analysis.

There are, however, some exceptions.  The ALJ determined that aside from Giddens's conflicts with her mother, the record during the relevant period (through the date of the ALJ's decision) showed that Giddens had only generally moderate limitations.  (Tr. 23); *Cauthen v. Saul*, 827 F. App'x 444, 446 (5th Cir. 2020).  The ALJ's summary of the evidence at Step Four is telling of how the ALJ viewed the evidence, emphasizing Giddens's treatment notes from January 2020 onwards.  Those treatment notes reflected only conflict between Giddens and her mother.  (Tr. 662, 812, 895).  In addition: (i) Giddens's reported that she was working full time in January 2020 (Tr. 662); (ii) Giddens's treatment notes between September 2019 and October 2, 2020 repeatedly documented that Giddens was doing well and stable (Tr. 611, 615, 664-65, 673, 677, 719, 722, 724, 727); (ii) Giddens reported to Clinical Counselor Lanigan that she could not recall the last time she'd hurt her brother (Tr. 791); (iii) Giddens repeatedly stated that her hobbies included hanging out with friends and visiting her dog even after her hospitalization (Tr. 186, 288, 787, 861, 880); (iv) Giddens's coursework involved attending five classes with class sizes of between 34 and 45 individuals (Tr. 50); (v) Giddens testified that she got along with her father and grandmother (Tr. 55); (vi) Giddens was able to go out and shop for clothes (Tr. 185); and (vii) Giddens's post-hospitalization group therapy notes repeatedly described her as cooperative, pleasant, engaged in discussion, and supportive of her peers (Tr. 791, 796, 801, 803-04, 806-10, 816-18, 822-24, 826-27, 829-31, 833-34, 836-38, 840-41, 843-44, 850-51, 857, 859-75, 877-96, 898-02, 904-05).

By contrast, Giddens's pre-2020 records documented outbursts towards her high school peers and teachers, including striking another student, attempts to harm her mother and brother, and generalized anger outbursts.  *See* (Tr. 187-88, 254-55, 290, 294, 323, 328, 347, 362, 370). These two sets of evidence paint two very different pictures of Giddens's ability to interact with

others.  But a commonsense reading of the ALJ's decision allows us to conclude that he resolved

the disparity in favor of the more recent treatment records.  *Buckathorn ex rel. J.H. v. Astrue*,

368 F. App'x 674, 678-79 (7th Cir. 2010).  Given that the relevant period for purposes of SSI

stretches from the date of filing through the date of the ALJ's decision, the more recent medical

records were sufficient evidence from which a reasonable mind could conclude that Giddens had

only moderate limitations in interacting with others.  *Biestek*, 139 S. Ct. at 1154; *Cauthen*, 827 F.

App'x at 446.

  The ALJ's Step Four findings, however, do not sufficiently fill in the gaps for his

analysis of the other areas of mental functioning.  Nevertheless, a Step Three error can also be

harmless if it is apparent that even had the ALJ employed the proper analysis he would have

found the claimant not disabled.  *M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 861 (E.D.

Mich. 2011).  The question becomes whether the court can say with confidence that a proper

analysis would have resulted in a finding of marked limitations in two or extreme limitations in

one the other areas of mental functioning.  *See id*; 20 C.F.R. pt. 404, Subpt. P., App. 1

§ 12.00A2b.  And courts must be careful to avoid resolving conflicts in the evidence in the first

instance or speculate as to how the ALJ might have resolved them.  *Rabbers*, 582 F.3d at 657;

*Juarez v. Astrue*, No. 2:09-CV-160, 2010 U.S. Dist. LEXIS 18090, at *17 (E.D. Tenn. Feb. 8,

2010).

  Although a close question, I find that the ALJ's omissions with respect to the third and

fourth areas of mental function were not harmless.  The ALJ found moderate limitations focusing

solely on Giddens's ADHD and its impact on her concentration and attention.  As noted above,

the third area of mental functioning also encompassed Giddens's ability to complete tasks in a

timely manner, sustain an ordinary routine and regular attendance, and work a full day without

needing more than the allotted number or length of rest periods.  20 C.F.R. pt. 404, Subpt. P., App. 1 § 12.00E3.  Giddens's accommodations, the interference of her treatment with her ability to attend regular classes, and symptoms from her panic attacks and depression would suggest limitations in her ability to persist and maintain pace, on top of those attributable to her ADHD.  *See* (Tr. 46, 50-53, 183, 187, 789, 793).  It could be argued, as the ALJ found with respect to the fourth area of mental functioning, that Giddens's symptoms were well-regulated when she was compliant with medication, such that no greater limitations were warranted.  But the relevant question is the degree to which Giddens could function "independently, appropriately, and effectively" when taking into account the supports Giddens received to cope with her symptoms.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.00D, 12.00F2.  In light of the accommodations Giddens already received, her reliance on her mother's assistance, and the fact that her symptom improvements were in the context of intensive treatment, I cannot say with confidence that the ALJ would have found no more than moderate limitations had he properly conducted his analysis of this area of mental functioning.  *Rabbers*, 582 F.3d at 657; *Juarez*, No. 2:09-CV-160, 2010 U.S. Dist. LEXIS 18090, at *17.

I find similarly with respect to the fourth area of mental functioning.  The record reflects that Giddens's tolerance for change and ability manage her symptoms is limited.  For example: (i) Giddens's symptoms became exacerbated following her transition to high school and its accompanying increased demands (Tr. 323); (ii) she was hospitalized after a period of family homelessness (Tr. 254); (iii) she had a "meltdown" after she was found ineligible to continue her IEP program (Tr. 356); (iv) she was placed in a Section 504 program upon a finding of substantial limitations on account of her anxiety (Tr. 313, 356); (v) she attempted suicide following a break-up, financial stress, and rehoming her dog (Tr. 784-86, 793); and (vi) she

punched herself when she became frustrated (Tr. 791).  Although Giddens's symptoms were well-managed with medication, as discussed above, her symptom improvements occurred in contexts whereby she was in intensive treatment, monitoring, and dependent on her family for support and to manage her medication.  (Tr. 183-85, 237).

The ALJ attempted to resolve this conflict in the evidence at Step Four when he found that Giddens had a "reasonable tolerance" for changes she could anticipate, "such as her grandmother's funeral."  (Tr. 26).  But that finding lacks logical coherence because it is the death of a family member that is the change in life circumstance, not the funeral itself.  The finding also lacks evidentiary support, as nowhere in the record did it say that Giddens could "foresee" her grandmother's passing.  The lack of meaningful engagement with the conflict in the evidence regarding Giddens's ability to adapt and manage her symptoms "independently, appropriately, and effectively" leaves it to the court to speculate as to how the ALJ would have resolved it.  20 C.F.R. pt. 404, Subpt. P., App. 1 §12.00F2.  Thus, I cannot say with confidence that had the ALJ conducted the proper analysis he would have found no more than moderate limitations in Giddens's ability to adapt or manage herself.  *Rabbers*, 582 F.3d at 657; *Juarez*, No. 2:09-CV-160, 2010 U.S. Dist. LEXIS 18090, at *17.

The ALJ's errors with respect to the third and fourth area of mental functioning leave open the possibility that, upon remand, the ALJ might find "marked" limitations in these areas of mental functioning, which would render Giddens disabled under the Listings.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.04B, 12.06B, 12.08B, 12.11B, 12.15B; 20 C.F.R. § 416.920(a)(4)(iii).  Thus, I cannot say confidently that "remand would be an idle and useless formality."  *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 520 (6th Cir. 2011) (quotation marks omitted).

2.      **Paragraph C**

The ALJ also failed to apply proper legal standards when he concluded that Giddens did

not meet the paragraph C criteria for Listings 12.04, 12.06, and 12.15.  42 U.S.C. § 405(g);

*Rogers*, 486 F.3d at 241.  The ALJ determined that Giddens did not meet the paragraph C2

criteria because:

> [Giddens] completed a partial hospitalization program … and intensive outpatient
> program … (Ex. 16F/4, 60, 63)  While both programs arguably offer psychosocial
> supports or highly structured settings, as conceived by the regulations, [Giddens]
> demonstrated better than "marginal adjustment," completing both programs
> without incident or delay.

(Tr. 23).  The ALJ's sparse reasoning failed to build an accurate or logical bridge between the

evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  The ALJ's analysis concluded that

Giddens demonstrated better than marginal adjustment without explaining how or why.  The fact

that Giddens was discharged from treatment, on its own, does not express how the ALJ

concluded that Giddens did not "have a minimal capacity to adapt to changes in [her]

environment or to demands that are not part of her daily life."  20 C.F.R. 20 C.F.R. pt. 404,

Subpt. P., App. 1 § 12.00G2c.

As discussed above in connection with the fourth area of mental functioning, there was

evidence in the record that Giddens's symptoms became exacerbated upon changes in her

environment and demands that led to hospitalizations, "meltdowns," and attempted suicides.  *See*

(Tr. 254, 313, 323, 356, 784-86, 793).  And Giddens's symptoms were managed with living

arrangements and accommodations the ALJ did not discuss or analyze outside of her

hospitalization and intensive outpatient treatment program.  Giddens's completion of her post-

hospitalization treatment programs was relevant to the ALJ's paragraph C determination.  20

C.F.R. pt. 404, Subpt. P., App. 1 § 12.00D2b (discussing degrees of restriction in psychosocial

27

rehabilitation programs and stating that a claimant could "begin participation at the most restrictive crisis intervention level but gradually improve to the point of readiness for a lesser level of support and structure and possibly some form of employment").  But without some explanation on the part of the ALJ addressing Giddens's ability to cope with changes in her routine in light of the degree of supports she received, "the ALJ has not articulated a sufficient basis enabling the court to determine whether the ALJ's Paragraph C conclusion is supported by substantial evidence."  *Dotson v. Comm'r of SSA*, No. 3:15-cv-1874, 2016 U.S. Dist. LEXIS 85957, at *41 (N.D. Ohio June 16, 2016).

The ALJ's error with respect to his paragraph C findings cannot be overlooked as harmless because satisfying the paragraph C criteria would also result in a finding of disability. 20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.00A2, 12.04, 12.06, 12.15.  Thus, I cannot say confidently that "remand would be an idle and useless formality."  *Stacey*, 451 F. App'x at 520.

### C.    Consultative Examination

Liberally construing Giddens's briefs, she argues that the ALJ erred by not ordering that she undergo a consultative examination.  ECF Doc. 9 at 5.  The Commissioner's brief doesn't address this issue.  *See generally* ECF Doc. 10.

Giddens has not established a basis for remand on account of the lack of a consultative examination.  "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."  *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. § 416.416.917).  Even liberally construing her brief, Giddens has not established in what way the medical record was inadequate for the ALJ to make a determination on her disability without a consultative examination.  *See*

*generally* ECF Doc. 6; ECF Doc. 9; *see also Erwin v. Edwards*, 22 F. App'x 579, 580 (6th Cir. 2001) ("Liberal construction does not require a court to conjure allegations on a litigant's behalf.").  Nevertheless, the ALJ may request a consultative examination if he deems it necessary on remand.

    **D.**    **Step Four**

Liberally construing Giddens's briefs, she argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating her subjective symptom complaints.  ECF Doc. 6 at 3-4; ECF Doc. 9 at 2-5.  She argues that the ALJ did not give sufficient consideration to her depression, anxiety, and homicidal and suicidal ideations, which, she argues, alone would render her disabled.  ECF Doc. 9 at 3.  She argues that she had constant outbursts, and major depressive episodes more than three times per month that last up to six days, her anxiety kept her in the house almost every day, and she'd attempted suicide around seven times.  *Id.*

The Commissioner disagrees, arguing that the ALJ reasonably determined that no greater functional limitations were warranted.  ECF Doc. 10 at 17-22.  The Commissioner argues that the ALJ properly discounted Giddens's subjective symptom complaints because they were at odds with evidence of benign objective exam findings, treatment notes reflecting improvements in her symptoms, and her "admitted level of activity."  ECF Doc. 10 at 19-22.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and

restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"
SSR 96-8p, 1996 SSR LEXIS 5 at *14.  Relevant evidence includes a claimant's medical history,
medical signs, laboratory findings, and statements about how the symptoms affect the claimant.
20 C.F.R. § 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5 at *13-14.  If an ALJ discounts
or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.
*Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Specifically, the ALJ's decision "must
contain specific reasons for the weight given to the individual's symptoms, be consistent with
and supported by the evidence, and be clearly articulated so the individual and any subsequent
reviewer can assess" how the ALJ evaluated the claimant's symptoms.  SSR 16-3p, 2016 SSR
LEXIS 4 *26 (Mar. 16, 2016).

The ALJ failed to apply proper legal standards in his evaluation of Giddens's subjective
symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the
regulations by: (i) assessing Giddens's RFC in light of the medical evidence, her testimony, and
other evidence in the record; and (ii) explaining that he rejected her subjective symptom
complaints because her statements regarding their intensity, persistence, and limiting effects
were not consistent with the record.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at
*3-4, 11-12, 15; SSR 96-8p, 1996 SSR LEXIS 5, at *13-15; (Tr. 24-27).  The ALJ did not,
however, provide sufficiently clear reasons for rejecting them.  SSR 16-3p, 2016 SSR LEXIS 4
*26.

In explaining his RFC findings, the ALJ stated:

[Giddens's] mental health impairments include multiple interrelated diagnoses of
bipolar disorder, PTSD, ADHD, as well as depressive and anxiety disorders, with
a history of learning impairment.  (Ex. 14F/64; 10F/15; 5F/3)  While [Giddens's]
allegations and testimony that she was not and is not able to maintain a full
collegiate course schedule and work part-time are consistent with the longitudinal
record, that is not the standard by which disability is established under the

30

Regulations.  [Giddens's] mental health records and ongoing diagnoses support that anxiety symptoms limit her to the performance of simple, routine and repetitive tasks which are not performed at a production-rate pace, and that she can make only simple work-related decisions.  Similarly, [Giddens's] combined symptoms dictate that she cannot be responsible for the safety or welfare of other[s].

Depressive and PTSD symptoms support that [Giddens] should have only occasional interactions with supervisors and a small group of familiar coworkers, but she should have no more than incidental contact with the public.  Any interactions with coworkers or supervisors must be limited to "superficial" encounters which do not require tasks involving sales, negotiation, conflict-resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction, or persuasion of others.  More frequent or substantive interactions with others are likely to exacerbate [Giddens's] anxiety, and thus trigger additional symptoms.

[Giddens's] records establish a pattern of poor response to unexpected life stressors, such as ending of a relationship, but reasonable tolerance for change when she is able to anticipate them, such as her grandmother's funeral.  (Ex. 10F/7; 17F/5)  She remains capable of responding appropriately to occasional changes in a routine and relatively static work setting, with any such changes explained or demonstrated for her in advance, and implemented gradually.

(Tr. 25-26).

The ALJ's first finding is puzzling because the ALJ agreed that Giddens's inability to maintain a full course schedule and work part-time *was* consistent with the record.  Consistency with the record *is* what the regulations require the ALJ to evaluate.  20C.F.R. § 416.929 ("[W]e consider all your symptoms … and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."); SSR 16-3p, 2016 SSR LEXIS 4 *33 ("We consider the individual's symptoms … and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record.").  The ALJ's finding that Giddens had a "reasonable tolerance" for changes she could anticipate, "such as her grandmother's funeral," as discussed above, lacks logical coherence or evidentiary

support.  And the ALJ's remaining findings were mere conclusions, without an explanation to bridge the gap between the *evidence* and the *result*.  *Fleischer*, 774 F. Supp. 2d at 877.

The Commissioner has not attempted to argue that the ALJ articulated sufficiently clear reasons for his RFC findings.  Instead, the Commissioner points to the ALJ's discussion of the evidence, from which the Commissioner extrapolates reasons that could have supported the ALJ's conclusions.  ECF Doc. 10 at 20-22.  But, again, we cannot accept the Commissioner's after-the-fact arguments as a substitute for the ALJ's own reasons for his findings.  *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 50.

The Commissioner's approach is understandable.  There is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.  But even an expansive view of the ALJ's decision cannot explain how the ALJ found Giddens's statements about her symptoms to be *consistent* while at the same time stating that the regulations do not measure the degree of her functioning based on that consistency.  It does not explain the ALJ's finding that Giddens had a "reasonable tolerance" for change when she'd had four previous suicide attempts and one hospitalization for planning suicide.  (Tr. 254, 325-26, 951).  It did not explain on what basis the ALJ determined that, notwithstanding Giddens's documented depressive and panic symptoms and the interruptions of her treatment on her ability to attend coursework, she could sustain an ordinary routine and regular attendance and work a full workday.  (Tr. 45-46, 51-52, 183, 187, 789, 793); *see* SSR 96-8p, 1996 SSR LEXIS 5 at *1 (explaining that the purpose of the RFC assessment is to determine the most a claimant can do in a work setting for 8 hours a day, 5 days a week).

The ALJ's Step Four analysis of Giddens's mental health impairments was required to be, as the ALJ himself acknowledged, "more detailed" than his analysis of Giddens's areas of mental functioning at Step Three.  (Tr. 23-24); *see* SSR 96-8p, 1996 SSR LEXIS 5, at *13.  But the ALJ didn't provide the promised detailed analysis, which compounded his Step Three errors. And the ALJ's Step Four error was further exacerbated by the VE's testimony that an employer would not tolerate more than 15% off task behavior or more than 6 absences in a year.  (Tr. 61). A remand is thus required.  *Minor v. Comm'r of Soc. Sec.*, No. 5:18 CV 2233, 2019 U.S. Dist. LEXIS 208935, at *34-35 (N.D. Ohio Dec. 5, 2019).

### E.  Step Five

Liberally construing Giddens's briefs, she last argues that the ALJ erred in determining that there were other jobs in the national economy that she could perform.  ECF Doc. 9 at 5-6. But because I recommend that the case be remanded so that the ALJ can revisit his Step Three and Step Four analyses, the court need not address this issue.  *See, e.g., Decorrevont v. Comm'r of Soc. Sec.*, No. 1:19-cv-137, 2020 U.S. Dist. LEXIS 1597, at *37 (S.D. Ohio Jan. 6, 2020); *Little v. Berryhill*, No. 1:17CV1756, 2018 U.S. Dist. LEXIS 116289, at *77 (N.D. Ohio June 4, 2018).

## IV.  Recommendation

Because the ALJ failed to apply proper legal standards by offering inadequate explanations for his Listings and RFC findings, I recommend that the Commissioner's final decision denying Giddens's application for SSI be vacated and that Giddens's case be remanded for further consideration.

Dated: May 4, 2022

Thomas M. Parker
United States Magistrate Judge

33

---------------------------------------------

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

34